[Civ. No. 34506.   Second Dist., Div. One.   Feb. 6, 1970.]

ELSTER'S SALES, Plaintiff and Respondent, v.
FRANK J. LONGO, Defendant and Appellant.

**COUNSEL**

William P. Camusi for Defendant and Appellant.

Title, Tannenbaum & Kaplan and Benjamin L. Kaplan for Plaintiff and Respondent.

## Opinion

**GUSTAFSON, J.**—Plaintiff Elster's Sales, a corporation, had long been in the business of furnishing and equipping restaurants. The Mikado Corp., a corporation with little assets, proposed to establish a Japanese restaurant in a building located on leased land in Oakland. The restaurant corporation contemplated an installation much more expensive than that for which it could pay in cash and therefore required a long period of time to pay the entire purchase price.

Elster's Sales had developed a program of handling such situations. An individually owned restaurant (as opposed to one of a chain) nearly always entailed a substantial degree of risk to one lending his credit to the restaurant owner. Moreover, if Elster's Sales had provided the credit without receiving the full purchase price immediately, the number of installations which Elster's Sales could make would be very limited. The solution was to sell the contract (of the restaurant owner to pay the stated price of the installation to Elster's Sales) to a finance company thereby immediately making Elster's Sales whole and enabling it to engage in making many more installations than it could have made if the contract had not been sold.

A finance company, however, does not buy a contract without certain assurances. One is that the finance company will earn a given amount as the debtor pays. For Elster's Sales to be assured that a finance company will buy the contract, the contract with the restaurant owner is prepared on the form provided by the finance company with finance charges and payment schedules as dictated by the finance company. The second assurance that a finance company wants is that if there is a default there are financially responsible guarantors to whom it may turn for immediate payment of whatever is then due. Third, the finance company insists that the original creditor sell the contract with recourse so that if the debtor defaults, the finance company may demand that the original creditor repurchase the contract.

With respect to guaranteeing payment by the restaurant owner, Elster's Sales obviously did not want to increase its contingent liabilities any more than was necessary and it found that there were always other persons acceptable to the finance company who were willing to guarantee payment of part of the debt. These were persons (such as linen suppliers, food suppliers, vending machine owners, etc.) who expected to profit by business done with the restaurant owner.

Thus when The Mikado Corp. began plans for its restaurant, Elster's Sales dealt with Westinghouse Credit Corporation (a finance company) to ascertain what would be needed for financing. This resulted in (1) a docu-

ment entitled "Purchase Agreement" executed by The Mikado Corp. and Elster's Sales May 17, 1962, reflecting a purchase price for the items listed therein of $169,854.48 of which $57,854.48 was paid in cash and the balance of $112,000 (plus a finance charge of $33,622.40) of which was to be paid in monthly installments of $2,427.04 over a period of five years, (2) written guaranties in favor of Westinghouse Credit Corporation by Elster's Sales in the amount of $25,000, by Red Star Industrial Service Company (a linen supplier) in the amount of $25,000 by defendant Frank J. Longo (an insurance broker) in the amount of $25,000 and by West Coast Vending (vending machine owners) in the amount of $5,000, (3) assignment with recourse by Elster's Sales of the contract requiring The Mikado Corp. to pay the balance due as stated therein and (4) receipt by Elster's Sales from Westinghouse Credit Corporation of $112,000 (the difference between the cash sales price and the down payment by The Mikado Corp.). Had the purchase contract been completed by The Mikado Corp. in accordance with the terms of the purchase contract, Westinghouse Credit Corporation would have received $33,622.40 for providing the financing.

Whether someone other than Elster's Sales would guaranty a portion of the purchase contract would depend upon the result of his comparison of the risk involved to the amount of business which he expected to do with the restaurant. Elster's Sales customarily introduced the prospective guarantor to the restaurant owner. Whatever arrangement was made concerning business between the prospective guarantor and the restaurant owner was the result of negotiations between them. The restaurant owner, who would be unable to make a purchase contract with Elster's Sales unless sufficient guarantors were obtained, understood that to induce a person to become a guarantor, the owner must agree to do business with that person.

With respect to defendant Longo, the record contains only the most sketchy evidence concerning the arrangements made between Longo and The Mikado Corp. All that is revealed is that Longo wrote three general three-year insurance policies on the property of the Mikado Corp. and two insurance policies on the lives of the corporate officers.

The restaurant had financial difficulties from the day it opened. By September 1964 The Mikado Corp. defaulted in its payments to the finance company whereupon the finance company demanded that Elster's Sales repurchase the contract for $100,879.27, the amount then due after deduction for the unearned finance charges. Elster's Sales persuaded Red Star Industrial Service Company and defendant Longo to each pay approximately one-third of this amount. It is difficult to understand why either of the two guarantors did so. At the time of the default, the liability of each under the guaranty was $25,000. The cost to each of repurchasing the

contract was in excess of $30,000. We can only speculate that by so doing, they hoped that a different finance company would buy the contract, that they would then get their money back and that the restaurant owner would ultimately be able to make a success of the business, whereas by not joining Elster's Sales in repurchasing the contract each would owe Elster's Sales $25,000, Elster's Sales would be unable to refinance the contract and little could be obtained from sale of the equipment and nothing from The Mikado Corp. to reduce the loss. However, the record is silent as to why Red Star Industrial Service Company and defendant Longo did what they did.

At any rate, immediately after the repurchase of the contract, Elster's Sales negotiated with C.I.T. Corporation, another finance company, for the purpose of having that finance company buy the contract. It was willing to do so, but only on certain conditions. One condition was that the terms of payment of the original contract be modified to permit lower installment payments by the restaurant owner and to extend the number of payments. Since this resulted in greater finance charges than those provided in the original contract, The Mikado Corp. was required to agree to pay an additional $12,609.42 evidenced by a promissory note dated November 17, 1964. Finally, the promises of The Mikado Corp. were to be guaranteed by third persons to Elster's Sales to the extent of two-thirds of the amount due but not to exceed $83,937.44.

Thereupon Elster's Sales procured on November 18, 1964, the signature of defendant Longo upon a document which guaranteed (to the extent of one-third of the amount due but not to exceed $41,968.72) the payment by The Mikado Corp. of "Conditional Sale Contract [described as a document dated May 17, 1962, between The Mikado Corp. and Elster's Sales] and said promissory note [of $12,609.42]." A similar document was signed on behalf of Red Star Industrial Service Company. The finance company then paid Elster's Sales the amount for which it had repurchased the contract from the first finance company and Elster's Sales in turn repaid defendant Longo and Red Star Industrial Service Company respectively the amount each had paid Elster's Sales for the purpose of repurchasing the contract from the first finance company.

A few months later the restaurant owner was again in default. Elster's Sales was called upon by C.I.T. Corporation to make up delinquent payments in the amount of $10,047.49 and to pay delinquent taxes in the amount of $3,432.78. Ultimately, Elster's Sales (acting for C.I.T. Corporation) sold for $8,000 that part of the property listed in the contract of May 17, 1962, which had not become part of the real property belonging to the landlord and Elster's Sales repurchased the contract of May 17, 1962, for $91,005.71. At that point The Mikado Corp. owed $104,485.98 under the

contract. The Mikado Corp. was bankrupt and the restaurant was no longer in existence.

Elster's Sales demanded of Red Star Industrial Service Company and of defendant Longo that each pay to Elster's Sales one-third of $104,485.98. Red Star Industrial Service Company did, but defendant Longo refused to do so. This suit followed and judgment was for plaintiff Elster's Sales against defendant Longo for $34,828.66 plus interest, attorney fees and costs. Defendant Longo appeals.

### CLAIM OF ILLEGALITY

Defendant Longo asserts that Elster's Sales "had formulated a plan to finance credit sales by the use of an insurance broker's guaranty which was to be given for an illegal consideration" and that "the guaranty of November 18, 1964, given by [Longo] to Elster's Sales constituted an illegal promise and consideration for the obtaining of insurance contracts from The Mikado Corporation." Defendant relies on sections 751, 752 and 755 of the Insurance Code[1] for his contention.

Whether what Longo did in 1962 to get insurance business was illegal and what effect any illegality would have had on the insurance contracts he wrote at that time or on the guaranty which he executed in 1962 are questions we need not answer. What is involved here is the guaranty of 1964. The record is devoid of any evidence that the 1964 guaranty was given to Elster's Sales in consideration for insurance business, or the promise of insurance business, from Elster's Sales, The Mikado Corp. or anyone else. Nor need we decide what, if any, consideration Longo received for executing the guaranty. ■ Assuming that consideration was necessary under section 2792 of the Civil Code, the fact that the guaranty was in writing imports consideration. (*Bank of America* v. *Granger* (1931) 115 Cal.App. 210 [1 P.2d 479].) ■ To raise the issue of lack of consideration, defendant should have pleaded this in his answer as an affirmative

---

[1]Section 751: "An insurer, or an insurance agent, broker, or solicitor, personally or otherwise, shall not offer to pay, directly or indirectly, as an inducement to enter into an insurance contract, any valuable consideration which is not clearly specified, promised or provided for in the policy, or application for the insurance, and any such consideration not appearing in the policy is an unlawful rebate."

Section 752: "Any person named as the insured in any policy or named as the principal, or obligee, in any surety policy or the agent or representative of any such person who, directly or indirectly, knowingly accepts or receives any unlawful rebate is guilty of a misdemeanor."

Section 755: "The paying or allowing of any commission or other valuable consideration on insurance business in this State to other than an admitted insurer or a licensed insurance agent, broker or solicitor is an unlawful rebate."

defense. (*Pastene* v. *Pardini* (1902) 135 Cal. 431 [67 P. 681].) He did not do so.

### EXTENT OF THE GUARANTY

■ Defendant's second contention is based on the fact that of the $169,854.48 worth of equipment and fixtures described in the "Purchase Contract," only $65,311 worth was removable personal property, the remaining $104,543.48 worth being items which became part of the real property and thus owned upon installation by the lessor of the restaurant premises. Defendant claims that because he guaranteed that The Mikado Corp. would pay its debts under the "Conditional Sale Contract," he guaranteed the payment of only $65,311 and since The Mikado Corp. paid more than that amount, his obligation was satisfied.

Although the 1964 guaranty refers to the 1962 contract as being a "Conditional Sale Contract" which title is inaccurate insofar as the provision purporting to retain title in the seller was ineffective as to those items which became part of the lessor's realty, the 1964 guaranty clearly refers to the "original time sales price of $203,476.88 and having a present unpaid balance of $113,296.73." At the time of the 1964 guaranty, defendant knew that more than $65,311 had been paid. It would have been pointless for him to have guaranteed an amount which already had been paid. The trial court correctly found that defendant understood that he was guaranteeing the balance due on the contract of May 17, 1962.

Defendant was never misled about the extent to which Elster's Sales could recover the property which it sold to The Mikado Corp. He had been in the banking business for 20 years, had guaranteed other contracts and notes during his 30 years as an insurance broker and had owned and operated three restaurants. Among other contracts which he had guaranteed were similar contracts where Elster's Sales installed fixtures and equipment. Both when he signed the 1962 guaranty and when he signed the 1964 guaranty, he was uninterested in the terms of the contract with The Mikado Corp. and never even asked to see the document.

The 1964 guaranty expressly guaranteed payment by The Mikado Corp. "irrespective of . . . the unsufficiency [sic], invalidity or unenforceability of any security therefor." The sole purpose of the contractual provision for retention of title by Elster's Sales was to secure the promises to pay by The Mikado Corp. When that provision became unenforceable as to items which became part of the realty, the 1964 guaranty was unaffected.

Finally, there was ample evidence that had The Mikado Corp. owned the premises so that the contract would have permitted Elster's Sales to remove such items as ductwork, wall partitions, ceilings, electrical fixtures,

plumbing fixtures and floors, the cost of removal would have exceeded the salvage value.

## Contractor's License

Plaintiff pleaded, and the court found, that "at all times pertinent to the within action, plaintiff was and now is a general building contractor, duly licensed to do business in the State of California." Defendant attacks the sufficiency of the evidence to support that finding since $200 worth of work was done prior to March 21, 1962, and the only evidence of plaintiff's licensed status prior to that date was the testimony of plaintiff's president.

In the absence of objection based on the best evidence rule, proof that plaintiff was licensed (required by § 7031 of the Bus. & Prof. Code) could be by testimony of one of its officers. (See *Kirman* v. *Borzage* (1944) 65 Cal.App.2d 156 [150 P.2d 3] and *Stephens* v. *Baker & Baker* (1957) 150 Cal.App.2d 558 [310 P.2d 73].)

But even if the proof required were documentary evidence from the registrar of the Contractors' State License Board under section 7080 of the Business and Professions Code, it would avail defendant nothing. The only work done prior to the time plaintiff unquestionably was licensed was inconsequential. When the contract which included that inconsequential work was executed, plaintiff held a valid license. Under the doctrine of *Latipac, Inc.* v. *Superior Court* (1966) 64 Cal.2d 278 [49 Cal.Rptr. 676, 411 P.2d 564] plaintiff substantially complied with the licensing statutes. The Mikado Corp. could not have avoided paying Elster's Sales because of the minor work done prior to March 21, 1962, and therefore neither can defendant Longo.

The judgment is affirmed.

Wood, P. J., and Thompson, J., concurred.

The petitions for a rehearing were denied March 6, 1970, and appellant's petition for a hearing by the Supreme Court was denied April 1, 1970.